Your Honors, my name is Mark Nurheim and I'm an attorney with the Law Offices at Barclay and I represent the petitioners Esther Jandu and her son, Manuel Duomo-Twinoboa. With the Court's permission, I'd like to reserve three minutes for rebuttal. Several issues were raised in the briefs, but today we'd like to focus on, at least we would submit, the one principal issue to be addressed that we believe that all the other issues are related to. And that issue we submit, the crucial issue, is that the agency failed to follow the applicable regulations at 8 CFR 245.10d, and therefore... Counsel, even if we agree with you, how does that help? Well, Your Honor, what we believe is that the actual regulation allows, would have allowed any period of at least 30 days upon notification that there was an error or that there had been a failure to pay the $1,000 penalty fee. It has provision that would allow the alien to correct that within 30 days of a notice telling the alien to do that and to correct it to pay that fee. So is your argument that the agency should have given notice to the petitioner of her ability to pay the money? They're required by the regulation, Your Honor, to do that, and they didn't do that, yes, Your Honor. What's your best case authority for the proposition that failure to follow the regulation is grounds for relief in an immigration context? I think we've cited in the case, I'd have to go through the brief, but I think we provided several references in there. I thought your references were to Estoppel. The argument was an Estoppel argument in part, Your Honor. But I think after we reviewed it, we believe that the failure to follow the INS regulations and the failure of the immigration judge when it was raised before the immigration judge where he just said that there was no jurisdiction for him to even consider that, even though the regulation itself says that that can be done and that you can file that $1,000 penalty fee, that you can do that at those three stages of the proceeding. In fact, I think the regulation also says something about being able to do it before the BIA. Did you make this specific argument in your briefs? I think we made the argument about 245.10d, and it was referenced several times through the brief. Well, but the argument you're making with us is that they failed to tell her through you that she had 30 days to pay the $1,000. Did you make that argument? We cited the reference in there. Your Honor, we were also talking about the rescission procedures, though, under 246, which is a related issue. But in review, after we've looked at all the briefing, I mean, that is the core issue that we wanted to make sure. Is your answer to me yes or no? Yes, I believe we argued it in the briefs, Your Honor. And where would I find that? I can — well, we mentioned that section of the statute. I'm talking about the argument, not the citation. Your Honor, I think we made — I think it was implied with what we were raising about the thing. I mean, I understand what you're trying to get at. Implication is not an express statement, right? It was not made as an express statement throughout. But I think when you read it, the sections about adjustment of status under the special provisions 245i or 12 — 8 U.S.C. 1255i, and — The thing that concerns me about your argument is really fairness to the other side. If you don't argue a point and then you come here and raise it for the first time, they haven't briefed that. Well, Your Honor, I mean, I thought we had raised it in the structure of the argument because we do cite that citation. And it had been raised — the issue of paying the $1,000 penalty fee had been raised before the immigration judge. It had been raised — and it had been raised, I believe, also in the argument that prior counsel also had made before the BIA. And there was even a notation in there that the $1,000 penalty fee had been paid. And it's actually in the administrative record. There is — there's the receipt for it in there, too, in addition to the reference to that through the other briefs, too, on appeal. Assuming the argument is properly in front of us. And I do think your argument has gotten a little better between the time of writing the brief and your standing here. Your Honor, sometimes that happens. And part of it's from enlightenment from the court, too. And it's something that happens after — in the heat. I don't think there was a surprise, though, that that was going to be changed. This is not the first time this has happened. I understand. But assuming that argument is properly in front of us, that is to say, assuming we are properly focused on this Regulation 24510D, which very specifically says that a petitioner, after notice, has 30 days to supply the $1,000. Well, there was notice. Whether the notice was sufficient is a question, because the notice doesn't say you have 30 days. It just says we're going to rescind. Within 30 days, Ms. Zandu's lawyer responds, but does not respond with the addendum and does not respond with $1,000. The closest her lawyer comes is footnote 2 to her letter that says — I'm sorry, it's footnote 2. The statute provides that certain applicants must pay $1,000. Esther was not ever advised she might be required to pay a penalty fee. If she had been so advised, she certainly would have complied. Well, in fact, as of the date of this letter, if this letter had had one of those supplements in the $1,000, we wouldn't be here. So how can I get past the fact that she had an option of paying the $1,000 right there had she read subsection D? She didn't do it. Well, Your Honor, I think the regulation itself says that she's supposed to be given a notice and be notified at the time to do it. And if I understand your argument, it is you're pointing out that prior counsel had identified it at least at some point after that. But in any event, she did pay it by May 19th, I believe, of 2000. And the — Yes. Outside the 30 days of the initial notice. Well, but the initial notice was essentially a rescission notice that we also argued in there, as you undoubtedly noticed, was that we've also argued that the rescission proceedings weren't properly followed either. But she did — she did raise that, and she did pay that notice. Is your — I'm now reading from subsection D. Is your argument that the first sentence of the regulation, far after the heading is, in ailing to file an adjustment of status application in accordance with Section 103.2 of this chapter, will be allowed an opportunity to amend to request, if it appears otherwise ineligible, shall notify the applicant. Are you arguing that the notification that says, listen, we're going to rescind, is not allowing an opportunity, because it does not allow the opportunity to amend, let's say, the face of the notice that says, we're going to rescind? Well, it just said that we're going to rescind, Your Honor. It doesn't say, though, this to me, when we read this, it says that the service shall notify the applicant in writing the service intent to deny the status and any requests relieved, and any required additional, unless supplement A to Form I-45a, and any required additional sum is filed within 30 days of the date of the notice. And to us, that seems to require that the notice that was sent to her had to have that language with it. I see. You're reading that second sentence as mandatory. That is to say, the service shall notify the applicant in writing of the intent to deny, and any other request, unless, let's say the requirement is, you, the service, shall notify, and you shall notify that we're going to do it unless you do the following. The second sentence is to say you would regard this regulation as requiring that in the notice there be the statement that you have 30 days to cure by payment of $1,000. Yes, we would, Your Honor. Okay. I get the argument. You wanted to say three minutes. Why don't we hear from the government, and then this may be with sufficient complexity, we'll let the government run over, or, you know, and then we'll see where  Thank you very much, Your Honor. Good morning, Your Honors. You may please the Court. I think the key point here is that it doesn't help him, even if this regulation was not complied with, which we don't concede, because under the statute and under the Carrillo-Gonzalez case, these diversity visas are an ephemeral item. Let me ask you this. Let's assume that we have an appropriately taken appeal, and the question is whether or not someone is entitled to the visa, one of these diversity visas. While the case is on appeal, the year comes to an end, and the government allocates all of the diversity visas, and the government comes in and says, sorry, they're all gone. Is that — can the government make that argument? Well, I think maybe the closest authority which addresses that point is the Adair case, and some of the cases cited by that in the Seventh Circuit. And there, the Seventh Circuit said if the petition there was a habeas or mandamus petition, there if the petition is filed prior to the expiration of the fiscal year, then perhaps this very strict rule that the visas expire at the end of the fiscal year, maybe there's some flexibility there because the agency is on notice at that point that it needs to reserve those visas. Well, was the agency on notice here that there was some dispute about whether she was entitled to this visa before the end of the year? There was no dispute at this point. The adjudication was done on September 10th. There was no dispute that the agency was on notice, that she thought that she was entitled or that there was some mechanism by which she could get it. Well, as of September 20th and September 30th, when the fiscal year ended, there was no dispute, there was no litigation. Well, there was a dispute. She had already sent the letter in saying, hey, wait a minute, I want a hearing. Not as of September 30th. That had not happened. Yes. After the end of the fiscal year. Oh, so the end of the fiscal year is when they finish giving them out? Yes. At the end of the fiscal year, under this Court's decision, Correo-Gonzalez lays out what the applicable law is. At the end of the fiscal year, by law, under section of the law. So the game's over as of September 30th? Yes. Well, what's this letter here that's originally sent to her on October 13th? I mean, you're saying that this letter is totally meaningless because you've already given them out. Well, she had been mistakenly granted adjustment of status on September 20th, under the law, under section 244. But this letter that the INS itself sends at the end of what you call the fiscal year is sent on October 13th. They're not saying, sorry, we've given them all out. They're saying, sorry, you're not entitled. It's saying we're rescinding. We're intending to rescind the adjustment of status. Well, to intend to rescind sounds as though there may be a chance that you're not going to rescind. I mean, this doesn't make any sense to me, that the government, with something in dispute. It's sort of like I bring a lawsuit to my neighbor and I are in dispute as to who owns the tree. I think I own the tree. He thinks he owns the tree. He wants to cut it down. He then cuts it down while the thing is in dispute and says, sorry, it's moot. The case goes away. You have no further rights. That doesn't make any sense to me. Well, as the Court pointed out in Carrillo, this is a very strict statute that, as of September 30th, the visas go away. In that case, there was questions about whether the doctrine of equitable tolling applied. The applicant said she was defrauded by her notary, and that's why she got her adjustment of status application late. It did not matter. Under this ---- But did those cases involve situations where the status had already been adjusted? No, they didn't. That's the difference in this case. The status had already been adjusted, so it's a different scenario than the cases you're citing. It's not, though, because it's not the adjustment. It's the status that you look at. It's the visas. The INS canceled the visas. And when they canceled the visas, those visas were reallocated to other people. Where is that in this record, that this visa was canceled and reallocated? Well, it's at pages 75 and 77 of the record. And at page ---- This particular visa was canceled. Where in the record does it say this particular visa was canceled? Well, on page 77. Well, on page 75 is where the parties and the attorney for the Xandus concede ---- Page 5 of the ---- Of the administrative record. Okay. It's where the Xandus attorney concedes that there was a cancellation of visas. 77 is the notice. It says the service has rescinded LPR status. Is that what you're talking about? Well, it also says on page 75 you're referring to. Which on 75. Oh, it canceled the visa. Right. On 75 there's a colloquy between the immigration judge and counsel for the service and for the. I thought that was the judge who said that. The judge says it. And then he says, counsel, do you agree with this? To both the service counsel and to the aliens counsel. And they both agree, yes, this is the case. And that issue was never raised again. It was not raised to the board. It was not raised to this court. And in the opening brief of Petitioner, the first time we ever saw that argument that, well, maybe this wasn't actually canceled, was in the reply brief. Is there anything in the record other than the IJ saying this and then saying, have I fairly and accurately stated the situation? And we have an oral court in Mississauga saying yes. Is there anything actually beyond the counsel's agreement with this statement? Yes, we have. On page 77. Okay. Please cancel in big, bold letters. Please cancel. All three. Had to revoke for lack of eligibility. It is the request. Where is the action canceling it? Well, we have on the I-213, which is the record of the portable alien, a reflection that there's no more visas available. We don't have in the record anything from the State Department. It was just not an issue. The aliens counsel accepted the word of the INS and the representation and the documents which are in the record, for example, this cancellation request, that, in fact, the cancellation was done. And we have the publications of the State Department saying all the visas for that year have been used up. There are no more visas. This is an awfully handy argument for the government because you're saying even if we were wrong, even if we were absolutely dead wrong, even if we had no right to cancel these, because we've canceled these, the applicant's out of luck. That just sounds like nothing but a game of gotcha. Well, it's not a game of gotcha because, remember, the alien here, the Zandu's, made two errors. First of all, they overstayed their visas by five years. But the law allows them to cure that in this situation if they timely apply and timely pay the $1,000. Which they did not do. And, of course, which you didn't tell them they could do, even though the regulation appears to say that you're required to tell them that. Well, there's under the regulation, of course, remember that, the provision regarding notice deals with all adjustment of status situations, not just to the diversity visa status. And I understand they're late in the year so that they get their final interview on the 20th and you're telling me that in 10 days the game is over. One of the reasons they're late is, of course, they go in and they're told at the front desk, you have to mail it to Nebraska. They mail it to Nebraska. Nebraska sends it back and says, no, you're supposed to go and hand it in, in person, which she finally does. I mean, this is the gang that can't shoot straight and is now holding it against her. Well, that's why a number of them, well, you know, she was given a break. She overstayed her visa. The law gave her a break. Number one, the break was you can apply for the diversity visa. Well, you can say the law gave her a break. The law is the law. And she's entitled to that. Did she get any other breaks from the service? I think the service has delayed and then possibly made a mistake. And you're telling me we don't even have the authority to address the mistake because she's so late in the year. Well, one of the reasons she's so late in the year is that she did this round-robin husband to Nebraska because the service said she had to do that. Isn't that right? Well, to some degree, that's right. To some degree. Am I wrong in my statement of what happened? The court stated the record correctly. But as in Korea and as the court in Adir in the Seventh Circuit, there's no relief that can be granted. And this Court in the Satir case found that the yes, some regulations were violated, but there's no relief that can be granted. There's simply no more visas. Is that your response, too, to the failure to hold a rescission hearing, that there's no relief that can be granted? Well, the rescission hearing is a different story. That's – I would suggest that the court is immaterial because she actually had a removal hearing. But the immigration judge said at the removal hearing that he had no jurisdiction to consider the rescission matter. Well, he had no jurisdiction to consider the fact that there was no visas left because it was – Isn't that a catch-22? You don't have a rescission hearing where the I.J. can consider rescission. You go to a removal hearing and at the removal hearing the judge says, well, it doesn't matter about the rescission hearing because we're at the removal hearing and I can't do anything. But the rescission and the visas are two separate things. The rescission goes to the adjustment of status. The visas – That's the point. But that hearing was never held, though. Yeah. But it's – there was no prejudice for two reasons. One, there were simply no visas. Nothing could be – what could she have said at a rescission hearing before the INS? There's no visas. In order to be eligible for adjustment of status, you have to have an immediately available visa. She did not have that. But she had a – in effect, a rescission hearing before an immigration judge. But at the rescission hearing, couldn't the immigration judge have said you violated this regulation and so she's ordered – her status is ordered to be reinstated? The IJ couldn't say that. You cannot say that and this Court can't say that under the Carrillo case because there are no visas available. Let me ask you this. You're saying that as of September 30th, all the visas had been handed out, and under your theory of the case, nothing matters after that. Is that right? That's right. Okay. Now, the notice was sent out to her on what date? October 13th. On October 13th. Now, if that had been a proper notice, that notice probably should have said, you have 30 days to send in your $1,000. But you're saying the government doesn't even have the power to say that because they've all been given out. Indeed, as of September 20th, when the INS spots the problem, she has 30 days that says the regulation to send in $1,000, but you're saying no because at the end of the fiscal year, she has only 10 days. But by the time you notify her of what you're going to do, she has minus 13 days. That can't – you've just written this regulation out of the books. Well, except the statute, 245I, says that if you submit an application without the $1,000, it is deemed as if you've never submitted it. But this very regulation is an implementation of the statute. You're not saying this regulation is invalid, are you? No, I'm not saying it's invalid. But I was trying to explain to the Court that this regulation is not designed specifically for diversity visa cases. It's designed for all types of cases. But it includes diversity cases, don't it? But many other cases are not so time-sensitive as these. So it's not a regulation which has no – If you're construing the interaction of the regulation, the granting of the visas and the regulation, simply to be unworkable. If there's a way of construing things so they work, I think that's the way you should construe it. You construed it in such a way that as soon as, on September 20th, she hands in her application on which it appears from the face of the application that she needs to hand in $1,000, as soon as she does that, she's got 10 days to cure it, even though she doesn't know that there's a problem, she doesn't know the cure that it's available to, and even though the government does not send out the required notice until October 13th, which, in your view, is already 13 days too late to do anything. How can that be the law? The law is that there were 55,000 visas allocable for the diversity year 1999. They have all been allocated. That is the problem. Have you read Oliver Twist and Mr. Bumble? He says the law is an ass. I don't think the law is. Meaning, this just doesn't seem to me an appropriate way of interpreting the regulations, which are complicated, but here they are. I think the problem is consistent with the Carrillo case, where the court found there is no equitable authority in either the immigration judge or the court to toll because of these diversity visa cases. I think I understand your position on that. This is all so far the argument has been, well, we can't get to whether or not there was a mistake because the visas are gone. Let's assume, for the purposes of argument, and I don't ask you to concede this, let's assume that if we think that her rights were violated, it is within the jurisdiction either of this court or of the immigration court to order that she be given the visa. And I don't ask you to concede that. Let's go as to whether or not there was an error here. Do you think there was? Was the service required to notify her under subsection D, service shall notify the applicant in writing that the service is intended to deny the adjustment of status application and any other requests for benefits and any required additional sums filed within 30 days? She's otherwise eligible. It says unless she is otherwise ineligible. As of October 1st, she was otherwise ineligible for the visa. Is there a way then? Because there were not. I'm asking you to assume that that is not a problem. I'm asking you to assume that that is not a problem. I understand you're not conceding it. Putting that problem to one side, was the service required to send her a notice that says you've got 30 days to cure by sending in $1,000? Yes. It was required to do so. The regulation says that you have to, you know, give the notice and an opportunity to assume. Let's assume. It doesn't say when, though, of course. It doesn't say the service has to give the notice immediately or has to pick up the telephone like the standards suggest. And the problem, of course, was you came 10 days before the end of the fiscal year. You had 55,000 visas were being adjudicated on top of all the other work of the agency. Notice was given of the rescission, but at that point, which was a few weeks later, after the adjudication, it was too late. And, of course, the adjudication and the rescission occurred on the same day. It was a mistake by the INS to grant the adjustment to begin with. And it realized that the very same day. We can't adjust this because she hasn't paid her $1,000 under Section 245. The Attorney General is barred from accepting this application. So that's the very same day. The Attorney General is barred from accepting the application, but the Attorney General is required to give her a notification that she has 30 days to hand in the $1,000. And the Attorney General didn't do that. That's true. But, of course, the regulation doesn't say, doesn't give a timeline. Oh, see, in your view, then, let's assume that this had happened early in the fiscal year, so that this comes to the attention of the Attorney General, the INS, say in January. They see the application, and they, for reasons of their own, decide not to send her the notice until the 20th of October, already following. They can do that? Well, of course, at this point. Of course, yes. Or, of course, something else. Can they do that? They can do that. They're, of course, vulnerable, like in many cases that we have published to a mandamus action. And that's how these mandamus actions have been filed. How are we going to get a mandamus action?  That's right. It's a difficult situation. It sounds like it's difficult. There's no question. And the fact that these visas are so ephemeral makes for a very draconian-type seeming situation. Yes, it seems to. But, nevertheless, there are 55,000 visas that have been allocated. And we keep getting back to that point. When it finally came to a hearing, I would also like to point out to the Court, under Section 246 of the INA, you don't have to go through a rescission hearing to rescind adjustment status. It was amended in 1996 to specifically say you don't have to first go through a rescission hearing, that an order of removal constitutes a rescission. So for the immigration judge, seeing no visas available, it was the appropriate action for the immigration judge to take. Can I ask you another question? And that is, do you object to our considering the Subsection D argument on the 30 days because it was not fully briefed in the blue brief? Well, that the – well, I think we would object to that. Because? Because I don't think it was fully briefed. It certainly was not mentioned at all in the reply brief. And, you know, when you're kind of whittling down what your arguments are, it would have been, you know, helpful at that point to say, well, that is the main argument that they're making. Would your objection be satisfied if we had further briefing on the point? If the Court wants to order that, the government, I guess, would have no objection. More questions? Thank you. I'd like to respond briefly, if I could, to some of the issues that you raised. The first thing I wanted to point out to the Court was, as we argued at page 8 and 9, I believe, of our opening brief, Ms. Jandu originally applied for the status in February. Page 89 of your opening brief? Page 8. Page 8. Page 8, excuse me, and 9. She originally applied for this process in February. The INS gave her incorrect instructions. They told her to file it at another office. They refused to accept it. And then she refiled again, finally, in March, when the INS Seattle office finally took over the case. So that added approximately a month to the procedure and the time that was involved. The second thing is the government counsel has been repeatedly arguing that Carrillo blocks consideration of this case. But there's a distinct difference. In Carrillo's case, the alien in that case did not specifically get issued a visa. There was no specific visa number under the diversity lottery cases that were allocated to her or to that applicant. In this case, the visa numbers were allocated on September 13th, and they were given to her at that time. And she adjusted her status, and then she held that visa status. Counsel, what's your response to opposing counsel's position that once the visas are all allocated, our hands are tied and the administrative law judge's hands are tied? Well, I think there's a big logical argument there, because the issue there, the first thing is they've argued that the diversity numbers were revoked. But there's no evidence in here. What he looks to at page 77 is a request notice that says, please cancel all three. Had to revoke for lack of eligibility. If you look at the top, there are the fax numbers, the fax correspondence numbers and dates. Those fax correspondence numbers and dates and times were all for September 13th. And that was, and they were all on the initial receipt. If you look at the page before, or the page later on, administrative record 78, those are the same numbers up there. That page, page 77, is, in fact, just a photocopy of what's at page 78. There's, and those show that that was the original request for the allocation of visa numbers. There's no proof in this record at all, other than that somebody wrote something that says, please cancel. We're arguing that they can't cancel something that they've already issued and she's already assumed that status. The last thing we have going on. Do we have any indication as to when this please cancel was written? No. I don't think there's anything on there. In fact, from my looking at this, I don't even see who wrote that. There's no signature line on that. It just says, please cancel all three. And that's a really important document. What about the block there that says, receive 731.00? What's that? Oh, that is, that's the date that this was filed with the, with the submission of documents by the immigration, by DHS and ICE counsel or INS counsel. This is one of their exhibits that they presented to the immigration judge. Now, the last thing I wanted to point out, if I could, because I guess I'm at my stop limit here, is that so far as alternatives for granting relief, in our reply brief at least, apparently three cases where the INS was ordered or adjudicated visa lottery petitions after the end of the fiscal year. Those three cases mentioned, those in part, are Adair versus INS, citing Penichow and Markatekic and Nagaya versus Ashcroft. In those cases, the INS was ordered to process the aliens' applications. In Nagaya, the INS was ordered to process Nagaya's diversity visa application and application of justice on the merits as if fiscal year 1998 had not yet expired. So, I hope that that, we're trying to show that those visa numbers were never revoked. She became eligible when she was given that number and that was her status at that time. And in terms of relief, there are court examples of where they have allowed this kind of remedy to cure the problem. And what we're all doing here is trying to argue whether she was eligible for cure under 245.10d. And we have court cases. Some of those were derived from the initial court cases that the government cited in a string citation of 44 cases. And some of those came out of that, Your Honor. So, that's, I guess, in conclusion, we're just hoping that we can get an order remanding the case, directing the INS that she still has her status as a lawful permanent resident and that she'd be, oh, that they consider that $1,000 fee as being timely filed. Thank you very much, Your Honors. Thank you. Thank you both for your arguments. The case of Zandu v. Ashcroft is now submitted for decision. Counsel, before you leave, could we have supplemental briefs? I'll do it here orally. If we could first have briefing from Mr. Klein on the question of subsection D, the argument you made here orally. And if you could submit that brief to our court within 10 days. With a page limit. And a page limit of, how do you want to do it, 15 pages? Page limit of 15 pages. I think that's more than ample given the briefing that already exists. And the government, 10 days after receipt of that brief, opportunity for response, 15 pages. No reply unless by order. That's to say, if you want to make a reply, you ask us for permission to reply. If I understand correctly, then, Your Honors, you want me to do a, you want us to do a summary then of the argument presented here and the rest of the argument developed under 245.10D. And the 30 days. That's right. Not the argument as to whether or not it is foreclosed because of the granting of the visas. But the question, the argument that you began with today and Judge Alarcon asked you, well, wait a minute, did you make this argument in your brief? And you had to say, well, not very much. Yeah. So if you could make that argument, 15 pages in 10 days, 10 days to respond after receipt of that brief. Thank you. Thank you. And we will defer submission of this case in terms of our internal processing until after receipt of those briefs. Thank you.
judges: Alarcon, W. Fletcher, Rawlinson